TIFFANY & BOSCO, P.A.
Richard G. Himelrick, #004738
J. James Christian, #023614
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile: (602) 255-0103
rgh@tblaw.com
jjc@tblaw.com

*Lead Plaintiffs' Liaison Counsel*

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Katharine M. Ryan, Esquire (*Pro Hac Vice*)
Christopher L. Nelson, Esquire (*Pro Hac Vice*)
Mark S. Danek, Esquire (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
kryan@sbtklaw.com
cnelson@sbtklaw.com
mdanek@sbtklaw.com

LABATON SUCHAROW LLP
Ira A. Schochet, Esquire (*Pro Hac Vice*)
Allan I. Ellman, Esquire (*Pro Hac Vice*)
Christopher J. Keller, Esquire (*Pro Hac Vice*)
Michael W. Stocker, Esquire (*Pro Hac Vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7077
ischochet@labaton.com
aellman@labaton.com
ckeller@labaton.com

*Lead Plaintiffs' Counsel*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **In re LIMELIGHT NETWORKS, INC. SECURITIES LITIGATION** | **Master File No. CV07-01603-PHX-SRB** |
| | **<u>Class Action</u>** |
| **This Document Relates To: ALL ACTIONS** | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs, the Robbins Group and Del G. Nuzum, ("Plaintiffs") individually and on behalf of all purchasers or entities of the common stock of Limelight Networks, Inc. ("Limelight" or the "Company") pursuant to and/or traceable to the Company's June 8, 2007 Initial Public Offering (the "IPO" or the "Offering"), by and through their attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Such information and belief is based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Limelight's public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This Consolidated Class Action Complaint (the "Complaint") alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") in connection with the initial public offering ("IPO") of nearly $240 million in Limelight common stock on or about June 8, 2007. Unbeknownst to investors, however, and in violation of the Securities Act, the Prospectus it filed in connection with the IPO failed to disclose that the Company was in the midst of a calamitous downturn in its business. When the Company belatedly began to reveal these problems in an August 9, 2007 report on its second quarter results, investors and analysts reacted swiftly: the Company's stock dropped thirty-nine percent in a single day, on an extraordinary volume of 7.5 million shares. Further adverse disclosures made in a Form 10-Q quarterly report filed on August 14, 2007 resulted in still further price declines. Limelight shares have still not recovered, and closed at $7.23 per share on January 29, 2008—barely half of their price in the offering.

2. Investors who purchased the Company's stock through the IPO had every reason to believe that Limelight's prospects were bright. Founded in 2001 as a Limited Liability Company, Limelight had quickly acquired a niche in the booming content delivery services ("CDN") market, offering high-speed delivery systems to customers wanting to provide distribution of video, music, games and social media over the internet.

3. What prospective investors in the Company did not know was that, in the months leading up to the June 8, 2007 IPO, the Company had experienced serious setbacks in its business.

4. By the end of March, 2007, three months before the IPO, the Company no longer had any anchor customers amounting to more than 10% of its business. By the end of the quarter ending March 31, 2007, sales to MySpace, a former top customer, had virtually evaporated. Less than a month later, the Company lost much of its business with Microsoft, formerly a customer that generated over 10% of its revenues.

5. Furthermore, by May of 2007, approximately one month before the IPO, the Company's television media customers had experienced a drop off in internet traffic due to seasonal changes in the television market. By the end of May Limelight itself was suffering a negative impact to its bottom line due to this seasonal drop-off in business.

6. In the midst of these difficulties, the Company pressed forward with its public offering. On June 7, 2007, it filed with the SEC a Registration Statement on Form S-1, which incorporated a Prospectus (collectively, "the Prospectus"). The Prospectus, which was signed by the Company's chief officers and members of its board of directors, failed to make any mention of the misfortunes that had beset the Company in recent months. Instead, the Prospectus:

(a) Failed to disclose that the Company had already lost virtually all of its business with MySpace, a top customer;

(b) Failed to disclose that the Company had already lost the bulk of its business with Microsoft, another top customer;

(c) Failed to disclose that the Company in fact no longer had *any* customer who made up more than ten percent of the Company's business; and

(d) Failed to disclose that Limelight's business was being materially and adversely affected by seasonal declines in revenue from its media customers.

7. On June 8, 2007, pursuant to the Prospectus, Limelight issued and sold 14.9 million shares of its common stock at an offering price of $15.00 per share, resulting in $205.5 million in net proceeds to the Company. Further, certain individual shareholders sold an additional 3.5 million shares of common stock through the IPO at the same price.

8. On August 9, 2007, just two months after the IPO, the Company surprised the investing public by revealing disappointing financial results for its second quarter of 2007. The Company also disclosed for the first time that its business for the second quarter of 2007 had been materially and negatively affected by the seasonal nature of the business from its television media customers.

9. On this news, shares of the Company's stock tumbled $5.81 per share, or over 39 percent, to close on August 9, 2007 at $8.99 per share, on unusually heavy trading volume.

10. Subsequently, on August 14, 2007, the Company for the first time revealed in its Form 10-Q for the Quarter Ended June 30, 2007, that:

(a) It had lost much of its business with MySpace by the early part of the second quarter of 2007—months before the IPO; that

(b) Despite its claims in the Prospectus, in the quarter ending March 31, 2007 the Company in fact had no customer that made up more than ten percent of its business, which reflected its loss of business from substantial and well-established name-brand companies; and that

(c) The Company had lost much of its business with Microsoft during the second quarter and that during that quarter, Microsoft did not constitute 10% of the Company's business.

11. The Company's stock dropped a further five percent on this news.

12. The failures of the Prospectus to disclose key information about the Company's business violates Section 11 of the Securities Act. Even though these deficiencies were not the result of fraudulent conduct, they run afoul of the Securities Act's imposition of strict liability for the inclusion of any material misstatements and omissions in a prospectus or registration statement. Under the Securities Act, an issuer is a guarantor of the accuracy of the Prospectus, while other defendants are strictly liable if the Prospectus is in any way false or misleading, subject only to the defense that due diligence could not have ascertained the truth.

13. Moreover, the individual defendants who signed the Prospectus and/or sold their stock through the IPO violated the strictures of Section 12(a)(2) of the Securities Act against the sale of stock by means of a prospectus containing false or misleading statements.

14. Finally, certain individual defendants, by virtue of their positions and ownership of the Company's outstanding stock, are liable for the false statements in the Prospectus under the control person provisions of Section 15 of the Securities Act.

## JURISDICTION AND VENUE

15. The claims alleged herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

16. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

17. Venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading statements, including the materially untrue and misleading Prospectus, occurred in this District. In addition, Limelight maintains its principal executive offices in this District at 2220 W. 14th Street, Tempe, AZ 85281.

18. Defendants directly or indirectly employed the means and instrumentalities of interstate commerce in connection with the acts alleged in this Complaint, including,

without limitation, the mails, interstate telephone conversations and the facilities of the national securities markets.

**THE PARTIES**

19. This action is brought on behalf of all purchasers of Limelight common stock pursuant to and/or traceable to the Prospectus.

20. Plaintiffs were appointed by this Court to serve as Lead Plaintiffs on October 31, 2007.

21. Plaintiffs purchased Limelight common stock pursuant to and/or traceable to the materially misleading Prospectus as set forth in various filings with the Court and incorporated herein by reference, and suffered damages when adverse information concerning the fact of and/or the effects of, *inter alia*, a revenue reversal, seasonality, the effects of pricing pressures, and the loss of a major customer by the Company were disclosed in August of 2007.

22. As described more fully herein, defendant Limelight is a Delaware corporation with its principal place of business located at 2220 West 14th Street, Tempe, Arizona.

23. Defendant Jeffrey W. Lunsford ("Lunsford") was, at all relevant times, the Company's Chief Executive Office ("CEO") and Chairman of the Board of Directors. Prior to joining Limelight in November 2006, Lunsford served as Chairman and Chief Executive Officer of WebSideStory, Inc., now known as Visual Sciences, Inc., a provider of real-time data analytics and visualization applications from April 2003. Lunsford signed the false and misleading Prospectus.

24. Defendant Matthew Hale ("Hale") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Secretary. From October 2005 until joining Limelight in December 2006, Hale served as President of S1 Corporation, a provider of custom interaction software for financial and payment services. Hale signed the false and misleading Prospectus.

25. Defendant Nathan F. Raciborski ("Raciborski") was, at all relevant times, the Company's co-founder, Chief Technical Officer ("CTO"), and a member of the Board of Directors. Prior to co-founding Limelight in June 2001, Raciborski was the co-founder and Chief Technical Officer of Aerocast, Inc., from 1999 to 2000. In the IPO, Raciborski sold 803,041 shares of Limelight stock at $15.00 per share totaling $12,045,615 in gross proceeds. Raciborski signed the false and misleading Prospectus.

26. Defendant Allan M. Kaplan ("Kaplan") was, at all relevant times, the Company's co-founder, and a member of the Board of Directors. In addition to his duties at Limelight, Kaplan also served as a Partner of Milestone Equity Partners from October 2001 to November 2003. In the IPO, Kaplan sold 620,742 shares of Limelight stock at $15.00 per share totaling $9,311,130 in gross proceeds. Kaplan signed the false and misleading Prospectus.

27. Defendant Walter D. Amaral ("Amaral") was, at all relevant times, a member of the Company's Board of Directors. Prior to serving as a director since May 2007, Amaral served as Senior Vice President and Chief Financial Officer of SiRF Technology Holdings, Inc. from August 2000 through March 2006. Amaral signed the false and misleading Prospectus.

28. Defendant Joseph H. Gleberman ("Gleberman") was, at all relevant times, a member of the Company's Board of Directors. In addition, Gleberman has been a Managing Director in Goldman, Sachs & Co.'s Principal Investment Area since 1993. Gleberman signed the false and misleading Prospectus.

29. Defendant Fredric W. Harman ("Harman") was, at all relevant times, a member of the Company's Board of Directors. Since 1994, Harman has served as a Managing Partner of Oak Investment Partners. Harman signed the false and misleading Prospectus.

30. Defendant Mark A. Jung ("Jung") was, at all relevant times, a member of the Company's Board of Directors. Prior to joining Limelight, Jung served as the Chief

Operating Officer of Fox Interactive Media, a subsidiary of News Corporation, from February 2006 to November 2006. Jung signed the false and misleading Prospectus.

31. Defendant Peter J. Perrone ("Perrone") was, at all relevant times, a member of the Company's Board of Directors. In addition to his duties at Limelight, Perrone has been a Vice President in Goldman, Sachs & Co.'s Principal Investment Area since 2002. Perrone signed the false and misleading Prospectus.

32. Defendant David C. Peterschmidt ("Peterschmidt") was, at all relevant times, a member of the Company's Board of Directors. From November 2004 through March 2007, Peterschmidt served as President and Chief Executive Officer of Openwave Systems, Inc. Peterschmidt signed the false and misleading Prospectus.

33. Defendant Gary Valenzuela ("Valenzuela") was, at all relevant times, a member of the Company's Board of Directors. Valenzuela has served a President of Powerplay Properties LLC since July 2000. Valenzuela signed the false and misleading Prospectus.

34. Defendant Michael M. Gordon ("Gordon") was, at all relevant times, the Company's co-founder and Chief Strategy Officer ("CSO"). From January 2003 through April 2004, Gordon served as a Consulting Expert to Keller Rohrback PLC, a law firm. In January 2005, Gordon joined Limelight full time. In the IPO, Gordon sold 400,651 shares of Limelight stock at $15.00 per share totaling $6,009,765 in gross proceeds. While defendant Gordon sold shares in the IPO, he did not sign the Prospectus.

35. Defendant William H. Rinehart ("Rinehart") was, at all relevant times, the Company's co-founder, and was the Company's President and CEO from June 2001 to October 2006 and was a member of the Board of Directors from August 2003 through October 2006. Prior to co-founding Limelight in June 2001, Rinehart served in a number of executive-level sales positions at Critical Path, Inc. from 1998 to 2000. In the IPO, Rinehart sold 504,790 shares of Limelight stock at $15.00 per share totaling $7,571,850 in gross proceeds. While defendant Rinehart sold shares in the IPO, he did not sign the Prospectus.

36. Defendants Lunsford, Hale, Raciborski, Kaplan, Amaral, Gleberman, Harman, Jung, Perrone, Peterschmidt, Valenzuela, and Gordon, as senior executive officers and/or directors of Limelight, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them. Because of their possession of such information, these defendants are liable for the Prospectus' failures to disclose material, adverse information to the public.

37. Because Defendant Rinehart sold stock in the IPO by means of the Prospectus, he is liable for the false and misleading statements contained in the Prospectus.

38. Defendant Goldman, Sachs & Co. ("Goldman Sachs") was one of five underwriters of the Company's IPO, as well as the lead manager of Limelight's IPO. Goldman Sachs is a leading global banking, securities and investment management firm. Defendant Goldman Sachs also served as a financial advisor to Limelight, and had a duty to ensure the accuracy of the Company's IPO materials.

39. Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") was an underwriter of the Company's IPO, as well as the joint lead manager of Limelight's IPO. Defendant Morgan Stanley had a duty to ensure the accuracy of the Company's IPO materials.

40. Defendant Jefferies & Company, Inc. ("Jefferies") was an underwriter of Limelight's IPO, as well as co-manager of the IPO. Defendant Jefferies had a duty to ensure the accuracy of the Company's IPO materials.

41. Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of Limelight's IPO, as well as co-manager of the IPO. Defendant Piper Jaffray had a duty to ensure the accuracy of the Company's IPO materials.

42. Defendant Friedman, Billings, Ramsey & Co., Inc. ("Friedman Billings") was an underwriter of Limelight's IPO, as well as co-manager of the IPO. Defendant Friedman Billings had a duty to ensure the accuracy of the Company's IPO materials.

43. Goldman Sachs, Morgan Stanley, Jeffries, Piper Jaffray, and Friedman Billings are collectively referred to as the "Underwriter Defendants."

44. As noted, above, in addition to effecting the sale of the 12.5 million shares constituting the core of the IPO, the Underwriter Defendants also effected the sale of an over-allotment of 2.4 million shares, also at $15.00 per share.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

45. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased shares of Limelight common stock pursuant to, and/or traceable to, the IPO and who were damaged thereby (the "Class"). Excluded from the Class are: defendants; members of the families of each of the individual defendants; any parent, subsidiary, affiliate, partner, officer, executive or director of any defendant; any entity in which any such excluded person has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

46. The members of the Class are so numerous that joinder of all members is impracticable. Over eighteen million shares of Limelight common stock were issued and sold pursuant to the IPO. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Limelight or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the class are similarly affected by defendants' conduct as complained of herein.

48. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class and securities litigation.

49. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the class. Among the questions of law and fact common to the Class are whether:

(a) the provisions of the Securities Act were violated by defendants' conduct as alleged herein;

(b) the Prospectus filed with the SEC in connection with the IPO contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) each of the defendants had a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus filed with the SEC in connection with the IPO at the time it became effective, but failed to do so;

(d) whether the price of Limelight common stock was artificially inflated due to the non-disclosures and misstatements complained of herein; and

(e) whether Plaintiffs and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

50. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

**The Nature of Limelight's Business**

51. Founded in June 2001 as a Limited Liability Company, Limelight provides high performance CDN services tailored to its customers' specific needs. According to the Company, its customers pay for the internet traffic that was delivered to them, but have the flexibility to purchase additional capacity as needed.

52. Historically, Limelight's business relied on a core set of customers, including media companies and other providers of online media content. Prior to its IPO, Limelight had nearly 800 customers across the globe, including many household names in the fields of video, digital music, new media, games, rich media applications and software delivery. Limelight's largest customers, based on its 2006 revenues, included MySpace.com and Microsoft. Microsoft alone generated more than 10% of the Company's revenues. *See* Prospectus at 71.

53. Limelight's contracts with its customers provided the Company with visibility into its quarterly revenues well in advance of the close of the quarter. The Company would enter into contracts with its core media customers for an average term of 12 months with minimum monthly volume commitments. The contracts also provided for charges to the media customers for any excess usage. Limelight's media customers typically locked-in to one to three-year contracts, but were permitted to change their monthly commitment levels if they deemed it necessary. Indeed, given the structure of Limelight's contracts, Friedman Billings analysts David Hilal and Philip Dionisio estimated, in a post-IPO July 18, 2007 report, that Limelight had visibility into approximately 90% of revenues at the beginning of each quarter. *See* Prospectus at 35-36.

**Limelight Loses Top Customers Prior to the IPO**

54. Although Limelight's business had historically been buoyed by individual customers which represented large shares of the Company's business, 2007 saw sharp declines in revenues from these sources. In 2006, revenue generated by the Company's

top 10 customers accounted for approximately 54% of its total revenue. By the quarter ending March 31, 2007, however, no single customer made up more than ten percent of the Company's business.

55. In fact, by the first quarter of 2007, the Company had lost nearly all of its business with its key customer, MySpace.com, whose needs it had been servicing through a reseller named CDN Consulting. In late 2006 MySpace elected to service its CDN needs in-house, and contracted with Limelight's rival, Akamai, to accommodate any overflow. Because, as estimated by industry analysts, MySpace represented as much as 20% of Limelight's 2006 business-- approximately $13.5 million in revenue-- the loss of this revenue was a huge, material blow to the Company's business.

56. The bad news continued when, in April of 2007, Microsoft, the Company's chief customer from the software market, followed suit and brought much of its CDN services in-house. To soften the adverse effect on Limelight's earnings from the loss of Microsoft as a direct customer, Limelight entered into a consulting deal with Microsoft in which Limelight agreed to help Microsoft build its in-house CDN network. Notwithstanding the consulting deal, however, Limelight still lost substantial and material amounts of revenue from Microsoft during that quarter.

**Limelight Suffers from Seasonality Problems before the IPO**

57. In addition to the problems the Company was seeing among its chief social networking and software customers, in the weeks preceding the IPO, the Company had cause for alarm about its business with media customers as well. In 2006 the Company saw increased sales to media companies of streaming video relating to televised programs, a type of business which experiences seasonal drop-offs when the television season ends each year in mid-May.

58. Indeed, with significant visibility into its revenue stream at the beginning of the quarter, the Company should have known early in its second quarter in 2007, preceding the IPO, that revenues for the second quarter, encompassing the end of the television season, would be materially lower than previous quarters, as its core media

customers (i) had only committed themselves to usage that they expected to need after the close of the television season, (ii) adjusted their minimum monthly usage requirements as they took into account the slow down of internet usage after the close of the television season and/or (iii) were not being charged for any excess usage.

**The IPO**

59. In connection with its IPO, on June 8, 2007, the Company filed with the SEC a Registration Statement on Form S-1, which incorporated the Prospectus. Through the Prospectus, Limelight issued and sold 14.9 million shares of its common stock including an Underwriter Defendants' over allotment of 2.4 million shares, at an offering price of $15.00 per share, resulting in $205.5 million in net proceeds to the Company. Further, certain individual shareholders sold an additional 3.5 million shares of common stock at $15.00 per share.

60. The Prospectus failed to disclose to investors material, adverse information about the Company's business.

**The Prospectus Failed to Disclose the Loss of MySpace.com**

61. Limelight's 2006 sales to MySpace were placed through a reseller, CDN Consulting. It appeared from the Prospectus that, while Limelight largely stopped placing orders through this reseller in 2007, it had made up for this loss in switching to direct sales to MySpace. This was false and misleading, in that the loss of sales to CDN was not offset by increased direct sales to MySpace, because MySpace had in fact moved these services in-house.

62. In the "risk factors" section of the Prospectus, the Company acknowledged that "[w]e may lose customers if they elect to develop delivery solutions internally" and that "[o]ur customers and potential customers may decide to develop their own content deliver solutions rather than outsource these solutions to CDN providers like us." What the Prospectus did not disclose was that the Company was currently experiencing just such a loss.

63. On page 34 of the Prospectus, Limelight reported a significant drop off of sales via resellers:

> In addition to selling to our direct customers, we maintain relationships with a number of resellers that purchase our services and charge a mark-up to their end customers. Revenue generated from sales to direct and reseller customers accounted for approximately 79% and 21% of our revenue in 2006 ***and approximately 98% and 2% of our revenue in the quarter ended March 31, 2007, respectively***.

64. However, Limelight failed to explain that this loss of business was the result of MySpace taking its CDN needs in-house, rather than that MySpace had decided to purchase services directly from the Company.

65. In fact, no negative implications were attached to this statement in the Prospectus. The Prospectus did not disclose that the cessation of most business dealings with CDN had any implications for Limelight's business with MySpace, which was one of the Company's core customers in 2006.

66. Indeed, although the Prospectus discusses business and customers, it fails to reveal that, in losing its business with CDN, Limelight had suffered a very significant loss of business from MySpace. Instead the Prospectus states only that Limelight has curtailed dealings with CDN Consulting, and that it would not have significant future sales to "*this reseller*".

67. Additionally, the Prospectus discusses a loss of business in 2005 from another major customer, MusicMatch.com, as the most recent and pertinent example of the loss of major business to a shift to in-house capabilities. In truth and in fact, the Company's loss of MySpace business at the cusp of the IPO was a *current* event of at least equal gravity that should have been disclosed.

68. The defendants undertook an affirmative duty when they discussed Limelight's business, the "in house" threat to its current and future business, its relationship with CDN Consulting, and the status of MySpace as a "core" customer in 2006, to disclose *all material facts* regarding these matters, including: (a) the level of

sales represented by MySpace in 2006; (b) that MySpace much more recently than MusicMatch.com had shifted its business from Limelight to its own in-house department; (c) that direct and indirect sales to MySpace has practically ceased; and (d) that Limelight was having and would have difficulty replacing such a large block of business while maintaining margins and fostering revenue growth.

**The Prospectus Failed to Disclose the Loss of Microsoft Business**

69. The Prospectus stated that "[t]wo customers, Microsoft and Disney, each accounted for more than 10% of our revenue in the quarter ended March 31, 2007."

70. This statement was materially false and misleading because it failed to disclose that, at the beginning of the second quarter, Microsoft had informed Limelight that it had decided to take its CDN network requirements in-house. Although Microsoft would continue to use Limelight as a consultant, this change in business resulted in substantially decreased revenues from Microsoft during the second quarter.

**The Prospectus Failed to Reveal that the Company No Longer Had Any Customers That Constituted 10% or More of its Business**

71. The Prospectus was materially misleading in claiming *any* customer made up more than 10% of the Company's business. In fact, in the six month period preceding the IPO, the Company had no such customers.

**The Prospectus Failed to Disclose that Limelight's Revenues Were Materially and Adversely affected by Seasonality of its Media Customers' Business**

72. The Prospectus discussed the Company's then present (and expected) experiences concerning seasonality of the Company's business. The Registration Statement stated, in relevant part:

> To date, we have not identified any seasonal fluctuations in our quarterly results. However, our rapid revenue growth may have overshadowed any impact of seasonality.

73. The foregoing statement was materially false and misleading because the network demands placed by Limelight's media customers were, in fact, affected by seasonal changes in television programming. As a result, orders from these customers would fall off as the television season ended in May.

74. Limelight should have been aware of this drop because its core customers (i) had only committed themselves to minimum commitment levels that took into account the slow-down of internet usage after the close of the television season; (ii) already renegotiated their monthly minimum usage levels prior to the close of the television season (and well in advance of the filing of the Prospectus) in anticipation of lower expected internet usage after the close of the television season; and/or (iii) were not being charged for any excess usage.

**Limelight Completes the Initial Public Offering**

75. By means of the false and misleading Prospectus, Limelight registered and sold 16,000,000 newly issued shares of its common stock.

76. The IPO was a success as reported by the Associated Press on June 8, 2007:

> Shares of Limelight Networks Inc. are expected to begin trading Friday after the Internet services provider's initial public offering raised net proceeds of about $170 million, far surpassing the company's initial expectations.

**The Truth is Revealed**

77. On August 9, 2007, the Company issued a press release entitled "Limelight Networks Reports Second-Quarter 2007 Results; Bookings Performance and Customer Additions Position Company for Continued Growth." Therein the Company reported a second quarter GAAP loss per diluted share of $(0.23) and non-GAAP earnings per diluted share of $0.00. Non-GAAP Adjusted EBITDA for the quarter was $4.4 million compared to $5.7 million for the second quarter of 2006.

78. In the same press release, the Company began to disclose that it had lost, during the second quarter, much of its CDN business to Microsoft, without mentioning that customer by name. The Company stated:

> Limelight Networks also disclosed an expanded 5-year individual customer arrangement pursuant to which Limelight Networks will provide custom CDN consulting services and will continue its content delivery services. Additionally, Limelight and the customer agreed to cross-license certain technologies, including certain components of Limelight's CDN software.

> ***This contract is a multi-element arrangement, which required a change, beginning in the second quarter, in how Limelight accounts for revenue from consulting, as well as the company's standard content delivery services to this customer.*** [Emphasis added.]

79. Also on August 9, 2007, the Company held an earnings conference call with investors and financial analysts. During this call, Defendant Lunsford acknowledged that the Company's revenues were subject to "***the seasonality that media companies experience after the television season ends.***" Lunsford offered no explanation why, in the Prospectus filed just weeks before, the Company asserted that it was unable to determine whether its revenues were subject to seasonal changes.

80. On this news, shares of the Company's stock declined $5.81 per share, or over 39 percent, to close on August 9, 2007 at $8.99 per share, with 7,567,500 shares traded, which was unusually heavy volume.

81. The August 9, 2007 stock drop was directly related to the disclosure of a precipitous fall-off in Limelight's revenues for the second quarter of 2007, and therefore the previously undisclosed facts that contributed to that decline, including the seasonality of the Company's business and its customer losses, and was unrelated to general stock market movements, industry related stock market movements, changed economic conditions or changed investor expectations.

82. On August 14, 2007, Limelight filed its Form 10-Q for the Quarter Ended June 30, 2007. The Company finally disclosed the surprising news that the cessation of dealings with the "reseller" referenced briefly in the Prospectus a*ctually meant that Limelight had lost its sales to MySpace itself.* For the first time the Company explained, at page 12 of its Form 10-Q, that:

> One of these top 10 customers [in 2006], CDN Consulting, which acted as a reseller of our services primarily to MySpace.com, represented approximately 21% of our total revenue for that period. At the end of 2006, MySpace became a direct customer of ours. During the six month period ended June 30, 2007, sales to the reseller CDN Consulting were less than 2% of revenue after this change…***In***

> ***the quarter ended June 30, 2007, sales to MySpace declined to approximately 2% of our revenue…. This significant reduction in the percentage of reseller revenue to total revenue [in the second quarter] is primarily the result of MySpace becoming a direct customer of ours in 2007."*** (emphasis added).

83. The August 14, 2007 filing also stated that

> For the three and six month periods ended June 30, 2007, the Company had no major customers for which revenue exceeded 10% of total revenue.

84. This directly contradicted the Prospectus, which states that Microsoft and Disney each accounted for more that 10% of revenues for the first quarter of 2007. *See* Prospectus at 71.

85. Because Microsoft had previously been identified as customer bringing in over 10% of the Company's revenues, the August 14, 2007 SEC filing's statement that there were *no longer* any such customers could mean only one thing to investors: that the new contractual arrangement described in the August 9, 2007 press release referred to Microsoft, and that the Company had experienced a substantial second quarter loss of revenue from Microsoft.

86. On August 23, 2007, Limelight officially disclosed that Microsoft was the customer with which it had struck the consulting deal announced on August 9, 2007. However, by that time investors were already aware that Microsoft was the customer affected.

**NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

87. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**COUNT 1**

**Against Defendants Limelight, Lunsford, Hale, Raciborski, Kaplan, Amaral, Gleberman, Harman, Jung, Perrone, Peterschmidt, Valenzuela, Goldman Sachs, Morgan Stanley, Jefferies, Jaffray and Friedman Billings For Violations of § 11 Of The Securities Act In Connection With the Prospectus**

88. Plaintiffs incorporate each and every allegation of ¶¶ 1-87 above by reference as if set forth fully herein.

89. Plaintiffs plead this Count and the other Counts based on the strict liability standard set forth in the Securities Act. No fraud has been alleged anywhere herein.

90. This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons or entities who acquired Limelight common stock pursuant to, or traceable to, the Prospectus. Plaintiffs bring this claim against Limelight, Lunsford, Hale, Raciborski, Kaplan, Amaral, Gleberman, Harman, Jung, Perrone, Peterschmidt, Valenzuela, Goldman Sachs, Morgan Stanley, Jefferies, Jaffray and Friedman Billings.

91. As alleged above, the Prospectus was materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements contained therein not misleading; and failed to disclose material facts.

92. All non-issuer defendants named in this Count owed to the acquirers of the stock, including the Plaintiffs and the other members of the class who acquired Limelight's common stock pursuant to or traceable to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time they became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading. Limelight, as the issuer, is strictly liable.

93. All of the defendants named in this Count, other than issuer Limelight : (i) signed the Prospectus; (ii) were directors of Limelight at the time the Prospectus was filed with the SEC; and/or (iii) served as underwriters for the offering. Further, none of the defendants named in this Count made a reasonable investigation or possessed

reasonable grounds for believing that certain statements contained in the Prospectus were true, complete and devoid of any misstatements or omissions of material fact. Therefore, each of the defendants named in this Count is liable to Plaintiffs, and the other members of the Class who acquired Limelight common stock pursuant to the Prospectus for the various misstatements and omissions contained therein under § 11 of the Securities Act.

94. Plaintiffs and other members of the class purchased Limelight common stock pursuant to and/or traceable to the Prospectus. At the time they purchased Limelight common stock, Plaintiffs and the other members of the class were without knowledge of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

95. By reason of the conduct alleged herein, each defendant named in this Count violated § 11 of the Securities Act. As a direct and proximate result of defendants' conduct, Plaintiffs and the other members of the Class have sustained substantial damage in connection with the purchase of the common stock issued pursuant to and/or traceable to the Prospectus.

## COUNT II

### Against Defendants Limelight, Raciborski, Kaplan, Gordon, Rinehart, Goldman Sachs, Morgan Stanley, Jefferies, Jaffray & Friedman Billings For Violations Of § 12(a)(2) Of The Securities Act in Connection With the IPO

96. Plaintiffs incorporate each and every allegation of ¶¶ 1-95 above by reference as if set forth fully herein.

97. This Count is brought pursuant to § 12(a)(2) of the Securities Act on behalf of all purchasers of Limelight common stock pursuant to, and/or traceable to, the Prospectus against Limelight, Raciborski, Kaplan, Gordon, Rinehart, Goldman Sachs, Morgan Stanley, Jefferies, Jaffray & Friedman Billings.

98. Each of the defendants named in this Count was an offeror, seller or solicitor of a security, specifically Limelight common stock, sold in the IPO.

99. By means of the Prospectus, defendants named in this Count offered, sold and/or solicited the sale of shares of the Company's common stock to Plaintiffs and/or other members of the class in return for proceeds of approximately $241 million.

100. The solicitations undertaken by each of the defendants named in this count other than Rinehart included participation in the preparation and dissemination of the false and misleading Prospectus. Additionally, one or more of the defendants named herein, other than Rinehart, participated in the acts detailed as follows: They made the decision to conduct the Offering, to do it at the selected offering price and to make the sale in the United States. One or more of the defendants named herein, other than Rinehart, actively and jointly drafted, revised, and approved and/or reviewed the Prospectus and other written selling materials by which the Offering was made to the investing public. These written materials were "selling documents" and calculated by these Defendants, other than Rinehart, to create interest in the securities offered and were widely distributed by defendants for that purpose. These defendants, other than Rinehart, finalized the Prospectus and/or caused it to become effective. But for the Defendants named in this count, other than Rinehart, having engaged in the foregoing activities, signed and/or drafted the Prospectus, the IPO could not have been made; and they conceived and planned the Offering and together, jointly engaged in all activities necessary to effect the sale of these securities to the investing public by issuing the securities, promoting the securities, and supervising their distribution and ultimate sale to the investing public. Rinehart is liable under this count by virtue of having sold Limelight stock in the IPO and pursuant to the Prospectus.

101. The Limelight common stock sold in the IPO by defendants named in this Count was offered and sold through the use of interstate communication, the use of interstate commerce, and the use of the mails.

102. The Limelight common stock was offered and sold through the use of the Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

103. Defendants named herein were obligated to make a reasonable and diligent investigation of the written statements made in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

104. Plaintiffs and other members of the class purchased Limelight securities pursuant to or traceable to the defective Prospectus. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

105. Those plaintiffs who continued to own Limelight securities offer to tender to Limelight their holdings in return for the consideration paid for the securities together with interest thereon.

106. By reason of the conduct alleged herein, each defendant violated § 12(a)(2) of the Securities Act. As a direct and proximate result of defendants' conduct, Plaintiffs and the other members of the class suffered substantial damage in connection with the purchase of the securities pursuant to, and/or traceable to the Prospectus.

**COUNT III**

**Against Lunsford, Hale, Raciborski, Kaplan, Amaral, Gleberman, Harman, Jung, Perrone, Peterschmidt, Valenzuela, and Gordon for Violations of §15 Of The Securities Act In Connection With The Prospectus**

107. Plaintiffs incorporate each and every allegation of ¶¶ 1-106 above by reference as if set forth fully herein. This Count is brought pursuant to §15 of the Securities Act on behalf of all persons who acquired Limelight securities pursuant to, and/or traceable to, the Prospectus.

108. The defendants named in this Count were each control persons of Limelight by virtue of their executive and/or directorial positions and/or their ownership of a significant percentage of the Company's outstanding stock. The defendants named in this Count had the power, and exercised the same, to cause Limelight to engage in the

violations of law complained of herein and were able to and did control the contents of the Prospectus.

109. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true and devoid of any omissions of material fact. By reason of their top executive positions at Limelight, ownership of a significant percentage of the Company's stock and/or their actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the Prospectus, each of the defendants named in this Count is jointly and severally liable to Plaintiffs and the other members of the class as a result of the wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of itself and the members of the class, pray for judgment as follows:

1. Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiffs and the other members of the class compensatory damages as a result of the wrongs alleged herein, including interest thereon;

3. Awarding Plaintiffs and the other members of the class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4. Granting Plaintiffs and the other members of the class such other and further relief as the Court may deem just and proper.

. . .

. . .

. . .

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all issues so triable.

DATED: January 30, 2008

Respectfully submitted,

s/ Richard G. Himelrick

TIFFANY & BOSCO P.A.
Richard G. Himelrick
J. James Christian
Third Floor Camelback Esplanade II
2525 E Camelback Rd
Phoenix, AZ 85016
Telephone: (602) 255-6000
Facsimile: (602) 255-0103
rgh@tblaw.com
jjc@tblaw.com

*Lead Plaintiffs' Liaison Counsel*

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Katharine M. Ryan, Esquire (*Pro Hac Vice)*
Christopher L. Nelson, Esquire (*Pro Hac Vice)*
Mark S. Danek, Esquire (*Pro Hac Vice)*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
kryan@sbtklaw.com
cnelson@sbtklaw.com
mdanek@sbtklaw.com

LABATON SUCHAROW LLP
Ira A. Schochet, Esquire (*Pro Hac Vice)*
Allan I. Ellman, Esquire (*Pro Hac Vice)*
Christopher J. Keller, Esquire (*Pro Hac Vice)*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0877
Facsimile: (212) 883-7077
ischochet@labaton.com
aellman@labaton.com
ckeller@labaton.com
mstocker@labaton.com

*Lead Plaintiffs' Counsel*

PASKOWITZ & ASSOCIATES
Laurence Paskowitz
60 East 42nd Street, 46th Floor.
New York, New York 10165
212-685-0969

*Of Counsel to Lead Plaintiffs*

ROY JACOBS & ASSOCIATES
Roy Jacobs
60 East 42nd Street, 46th Floor.
New York, New York 10165
212- 867-1156.

*Of Counsel to Lead Plaintiffs*

X___I hereby certify that on the 30th day of January, 2008, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- **Maureen Beyers**
  mbeyers@omlaw.com,lsmock@omlaw.com,ecfdc@omlaw.com
- **Mark S Danek**
  mdanek@sbtklaw.com
- **Alan I Ellman**
  aellman@labaton.com,cchan@labaton.com,ElectronicCaseFiling@labaton.com
- **Alan S Goudiss**
  agoudiss@shearman.com,lmaynard@shearman.com
- **Deborah R Gross**
  debbie@bernardmgross.com,susang@bernardmgross.com
- **Laurence Jesse Hasson**
  hasson@whafh.com
- **Roy L Jacobs**
  rljacobs@pipeline.com
- **Christopher J Keller**
  ckeller@labaton.com,ElectronicCaseFiling@labaton.com
- **Jeffrey Alan Klafter**
  jak@klafterolsen.com

- **Christopher L Nelson**
  cnelson@sbtklaw.com,dpotts@sbtklaw.com
- **Gregory Mark Nespole**
  nespole@whafh.com
- **Andrei V Rado**
  arado@labaton.com,cchan@labaton.com,ElectronicCaseFiling@labaton.com
- **Darren J Robbins**
  E_File_SD@csgrr.com
- **David B Rosenbaum**
  drosenbaum@omlaw.com,kdourlein@omlaw.com,ecfdc@omlaw.com
- **Samuel H Rudman**
  srudman@lerachlaw.com,E_file_ny@lerachlaw.com
- **Katharine M Ryan**
  kryan@sbtklaw.com,dpotts@sbtklaw.com
- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com
- **Ira A Schochet**
  ischochet@labaton.com,ElectronicCaseFiling@labaton.com
- **Michael W Stocker**
  mstocker@labaton.com,ElectronicCaseFiling@labaton.com
- **Aravind Swaminathan**
  aswaminathan@wsgr.com,scarpenter@wsgr.com

__X__ I hereby certify that on the 30th day of January, 2008, I served the attached document by United States mail on the following, who are not registered participants of the CM/ECF System:

**Phillip C Kim**
The Rosen Law Firm PA
350 5th Ave
Ste 5508
New York, NY 10118

**Laurence Matthew Rosen**
The Rosen Law Firm PA
350 5th Ave
Ste 5508
New York, NY 10118

s/ Shelley Boettge